USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  APR 0 9 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                          :
THOMAS CANTY,                             :
                                          :
                          Plaintiff,      :        13 Civ. 5629 (KBF)
              -v-                         :
                                          :        OPINION & ORDER
                                          :
CHRISTINE MCCORMICK DAY, et al.,          :
                                          :
                          Defendants.     :
                                          :
----------------------------------------------------------- X
                                          :
TAMMY M. FEDERMAN,                        :
                                          :
                          Plaintiff,      :        13 Civ. 5977 (KBF)
              -v-                         :
                                          :        OPINION & ORDER
                                          :
CHRISTINE MCCORMICK DAY, et al.,          :
                                          :
                          Defendants.     :
                                          :
----------------------------------------------------------- X
KATHERINE B. FORREST, District Judge:

Plaintiffs Thomas Canty and Tammy M. Federman bring these derivative

actions on behalf of nominal defendant lululemon athletica inc. ("lululemon" or the

"company") against thirteen current or former lululemon directors or executives for

violations of Section 14(a) of the Securities Exchange Act and Rule 14a-9

thereunder, as well as state law claims for breaches of fiduciary duties, arising out

of "serious quality control problems" and "materially false and misleading

statements" that were made concerning those problems.  (See Am. Compl. ¶¶ 2,

209-238, ECF No. 20.)  Plaintiffs' claims center around lululemon's March 2013

recall of one of its "flagship" products—its black luon yoga pants—and the events that followed, including the announcement of the departure of lululemon's chief executive officer ("CEO") and stock sales by its founder and Chairman of the Board of Directors in June 2013.  (See id. ¶¶ 15-34.)

      Plaintiffs originally filed these actions on August 12 and 23, 2013, respectively.  On October 3, 2013, these actions were transferred to the undersigned and consolidated for pretrial purposes.[1]  In an order dated October 24, 2013, and as discussed at the conference that day, the Court ordered plaintiffs to either file an amended complaint or designate one of the two previously filed complaints as the operative complaint.  (ECF No. 9.)[2]  On November 8, 2013, plaintiffs designated the complaint in Canty v. Day et al., as the operative complaint.  (ECF No. 11.)  Defendants thereafter moved to dismiss the operative complaint on December 11, 2013 pursuant to Federal Rule of Civil Procedure 23.1.  (ECF Nos. 12-14.)  By letter dated December 18, 2013, plaintiffs requested leave to file an amended complaint.  (ECF No. 15.)  The Court granted plaintiffs' request, indicating that it was its intention to rule on the sufficiency of the pleadings only once.  (ECF No. 18.)

      Plaintiffs thereafter filed an amended complaint on January 17, 2014.  Defendants again moved to dismiss pursuant to Rule 23.1 on January 31, 2014, and the motion became fully briefed on February 21, 2014.  The Court held argument on the motions on April 4, 2014.

---

[1] Also pending before this Court is the related securities class action litigation, In re Lululemon Securities Litigation, 13 Civ. 4596 (KBF), which involves many of the same facts and allegations as are at issue in these actions.

[2] Unless otherwise specified, all ECF references in this Opinion are to the docket in Canty v. Day et al., 13 Civ. 5629 (KBF).

For the reasons set forth below, defendants' motion to dismiss is GRANTED and these actions are DISMISSED without prejudice.

I.    FACTS

    A.    <u>The Parties</u>

Plaintiffs Canty and Federman have been holders of lululemon stock since June 2011 and May 2010, respectively.  (Am. Compl. ¶¶ 46, 47.)

Defendants Robert Bensoussan, Michael Casey, RoAnn Costin, Christine McCormick Day, William Glenn, Martha A.M. Morfitt, Rhoda M. Pitcher, Thomas S. Sternberg, Jerry Strizke, Emily White, and Dennis J. Wilson (collectively, with the exception of Day and Wilson, the "Director Defendants") served as lululemon's Board of Directors on the date the instant actions were filed.  (<u>Id.</u> ¶¶ 49-50, 53-61.) Director Defendants Casey, Morfitt, Glenn, and White served on the Board's Audit Committee during the "Relevant Period" (which is defined as 2012 to present).  (<u>Id.</u> ¶¶ 1, 53, 54, 57, 61, 63.)  Director Defendants Bensoussan, Casey, Pitcher, and Stemberg served on the Board's Nominating and Governance Committee during the Relevant Period.  (<u>Id.</u> ¶¶ 54, 55, 58, 59, 64.)

Day served as lululemon's CEO from July 2008 until January 2014.  (<u>Id.</u> ¶ 49.)  Day's resignation was announced on June 10, 2013, but she remained with lululemon until her successor officially took over as CEO in January 2014.  (<u>Id.</u>)

Wilson is lululemon's founder, and has been a member of the Board and the company's largest individual shareholder since 1998.  (<u>Id.</u> ¶ 50.)  Wilson has served as Chairman of the Board since 1998, but announced in December 2013 that,

although he will remain on the board, he intends to resign as Chairman shortly before lululemon's annual meeting in June 2014.  (Id.)  The company's Annual Report on Form 10-K that was filed on March 21, 2013 states that Wilson "controls a significant percentage of our stock and is able to exercise significant influence over our affairs," and that he "is able to influence or control . . . the election of directors."  (Id.)

Defendant John E. Currie has served as an Executive Vice President ("EVP") and CFO at lululemon since January 2007.  (Id. ¶ 51.)  Defendant Sheree Waterson served as Chief Product Officer until April 15, 2013, and previously served as EVP, General Merchandise Management and Sourcing beginning in June 2008.  (Id. ¶ 52.)  Neither Currie nor Waterson are alleged to be or to have been directors.

B.   Lululemon

Nominal defendant lululemon is a Delaware corporation with its principal executive offices in Vancouver, British Columbia.  (Id. ¶¶ 1, 48.)

Lululemon designs and sells premium athletic apparel and accessories, including yoga pants, shorts, and tops.  (Id. ¶ 3.)  Lululemon's business model involves selling garments at high prices (approximately $100 per pair of pants and $60 per shirt) based upon their purported high quality, offering minimal discounts, and maintaining low store inventory to drive demand.  (Id. ¶¶ 3, 70, 142.)  Lululemon's most important and popular products are women's fitness pants designed from a proprietary material known as "luon."  (Id. ¶ 71.)

During Day's tenure as CEO, the Company's apparel sales led to enormous growth. (Id. ¶ 83.) In just a few short years, from 2009 to 2012, lululemon quadrupled annual revenues to $1.37 billion, quadrupled gross profits to $763 million, and more than doubled its number of stores to over 200. (Id.) Fueled by strong financial results, lululemon's stock price increased dramatically, from approximately $4 per share at the beginning of 2009 to approximately $70 per share at the end of 2012. (Id. ¶ 85.) Black-colored luon products, a significant driver of sales, contributed substantially to this success. (Id.)

C.    The Alleged Wrongdoing

Plaintiffs allege that the Director Defendants were aware of certain "red flags" concerning quality control issues at lululemon. Specifically, in November 2007, The New York Times revealed that the Company's "Vitasea" line of seaweed fabric—which lululemon claimed released "marine amino acids, minerals, and vitamins into the skin"—in fact contained no seaweed at all. (Id. ¶¶ 7, 90.) Lululemon was forced to apologize for and withdraw its prior claims of the line's health benefits and Wilson was forced to concede that in fact no tests had been conducted to confirm the veracity of these claims. (Id. ¶¶ 90, 91.)

In December 2010, it was revealed that the company shipped and distributed reusable shopping bags that had been printed using ink containing high levels of lead. (Id. ¶¶ 8, 94.)

In late 2011 and 2012, many customers complained that luon garments "bled" when used during exercise, or when it came into contact with sweat or water. (Id. ¶¶ 9-10, 96, 100.)

In February and March 2013, customers began reporting that certain brightly colored luon pant fabrics were sheer when worn. (Id. ¶ 106.) Lululemon initially offered a disclaimer with these products as to their "sheerness." (Id.) Ultimately, however, following the close of trading on March 18, 2013, lululemon announced a recall of its black luon pants and crops, and offered refunds for all affected products (the "Black Luon Recall," or the "Recall"). (Id. ¶ 107.) This resulted in a reduction in the company's revenue guidance for the first quarter of 2013 by approximately $20 million, or 5%, from $350-$355 million to $333-$343 million. (Id.) The company announced three days later that lululemon expected to lose $57-$67 million in revenue and $0.25-$0.27 in earnings per share ("EPS") during the 2013 fiscal year due to the Recall. (Id.)

Day's resignation from lululemon was announced in an earnings press release on June 10, 2013, after the close of trading that day. (Id. ¶¶ 129, 168.) Media reports suggested that her departure was tied to the Black Luon Recall. (Id. ¶¶ 130-31.)

According to news reports in October 2013, lululemon continued to receive additional complaints about the transparency of its yoga pants following the Recall, as well as "pilling"—small balls of fabric accumulating on the surface of the product. (Id. ¶ 133.) On December 12, 2013, lululemon announced a $30 million cut to

6

earnings guidance for the fourth quarter of 2013, or nearly 5%. (Id. ¶ 138.) On January 13, 2014, the company revised its fourth quarter 2013 revenue and EPS projections downward due to a "meaningful" drop in sales attributed to quality control failures and related events. (Id. ¶ 177.)

On June 7, 2013, Wilson sold 607,545 lululemon shares for proceeds of nearly $50 million. (Id. ¶ 196.) This was the largest single day sale he ever made. (Id. ¶ 197.) All told, between June 4 and June 7, 2013, Wilson sold one million lululemon shares for proceeds totaling $81 million at stock prices near lululemon's all-time high. (Id.) These sales constituted more than half of all of his sales during the Relevant Period. (Id. ¶ 197.)

Over a six-month span during the Relevant Period, Wilson sold almost 2.3 million lululemon shares for proceeds of over $184 million. (Id. ¶ 194.) Plaintiffs challenge Wilson's trades from June 4-7, 2013 as suspicious based on the timing of the announcement of Day's resignation—after the close of trading on June 10, 2013—and the fact that the Board was informed of her resignation on June 7 (the previous Friday). (Id. ¶¶ 33, 169.) Plaintiffs cite media reports which state that Day's resignation announcement was "unexpected." (Id. ¶ 171.) Plaintiffs allege that the Director Defendants and the members of the Audit Committee "caused" the press release disclosing Day's resignation to be issued on June 10, 2013. (Id. ¶ 208.b.i.)

Plaintiffs allege that Wilson's stock sales were made pursuant to "a pre-arranged stock trading plan that Wilson agreed to in December 2012." (Id. ¶ 32.)

7

Plaintiffs allege that Wilson's trading plan allowed him to sell lululemon stock on a semi-regular basis, and up to 5.7 million shares over an eighteen-month period. (Id. ¶ 195.) Plaintiffs further allege that the trading plan did not establish pre-set amounts for each planned sale, and that there were no limits placed on Wilson's discretion regarding the size of these sales. (Id. ¶¶ 32 n.6, 195.)

As compared to the company's stock price at the end of the day on June 10, 2013, lululemon's stock price fell by nearly 18% by the end of the day on June 11, 2013, and by a total of 22% by the end of the day on June 12, 2013. (Id. ¶¶ 170-71.)

During the Relevant Period, Day sold 196,043 shares of lululemon stock for over $14 million. (Id. ¶ 200.) Plaintiffs allege that Day capitalized on spikes in the stock price in September 2012, December 2012, and September 2013 following statements she issued concerning the company's quality assurance issues. (Id. ¶¶ 201-03.)

D.   April 30, 2013 Proxy Statement

Plaintiffs allege that "Defendants"[3] caused lululemon to disseminate a proxy statement dated April 30, 2013 (the "2013 Proxy") to shareholders in connection with the company's annual shareholder meeting. (Id. ¶ 204.) Plaintiffs allege that "Defendants drafted, approved, reviewed and/or signed the 2013 Proxy before it was filed with the SEC and disseminated to Lululemon shareholders." (Id.) Plaintiffs allege that "Defendants knew, or were deliberately reckless in not knowing, that the 2013 Proxy was materially false and misleading." (Id.)

---

[3] Plaintiffs use the term "Defendants" to refer to all thirteen defendants in both actions.

The two pieces of the 2013 Proxy that are excerpted in the Amended Complaint concern defendants Day and Wilson.  With respect to Day, the 2013 Proxy describes her history with the company, her prior work history, her service on other boards of directors, and her educational background.  (Id.)  The 2013 Proxy states: "Our board of directors selected Ms. Day to serve as director because she is our Chief Executive Officer and she has extensive experience in sales and marketing, managing retail focused operations, international operations, corporate finance and strategic planning."  (Id.)

With respect to Wilson, the 2013 Proxy notes that Wilson's current position is Chairman of the Board.  (Id.)  The 2013 Proxy states: "Our board of directors believes that Mr. Wilson, as the founder of lululemon, is in a unique position to support continuity in both the product vision and the cultural values of our company that have been an integral part of our success, and his role as Chairman of the Board enables him to be more effective in this role."  (Id.)

## II.   LEGAL STANDARDS

### A.   Rule 23.1 Pleading Requirements

Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 23.1.  Rule 23.1 requires that a plaintiff in a shareholder derivative action "state with particularity . . . any effort by the plaintiff to obtain the desired actions from the directors . . . and . . . the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).  This rule sets forth a "rule of pleading" as to "the specificity of facts alleged with regard to efforts made to urge a

9

corporation's directors to bring the action in question," which is referred to as "demand" on the corporation. Halebian v. Berv, 590 F.3d 195, 206 n.7 (2d Cir. 2009) (internal quotation marks and citation omitted).

The "adequacy" of a plaintiff's pre-suit demand efforts "is to be determined by state law absent a finding that application of state law would be inconsistent with a federal policy underlying a federal claim in the action." Id. (internal quotation marks and citation omitted).  It is undisputed that lululemon is a Delaware corporation and that Delaware law thus governs. See Scalisi v. Fund Asset Mgmt., L.P., 380 F.3d 133, 138 (2d Cir. 2004) ("The substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief.").

"'In contrast to a motion to dismiss pursuant to Rule 12(b)(6), a Rule 23.1 motion to dismiss for failure to make a demand is not intended to test the legal sufficiency of the plaintiffs' substantive claim.  Rather, its purpose is to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf.'" In re SAIC Inc. Derivative Litig., 948 F. Supp. 2d 366, 376 (S.D.N.Y. 2013) (citation omitted). "'Because Rule 23.1 requires that plaintiffs make particularized allegations, it imposes a pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6).'" In re Am. Int'l Grp., Inc. Derivative Litig., 700 F. Supp. 2d 419, 430 (S.D.N.Y. 2010), aff'd, 415 F. App'x 285 (2d Cir. 2011) (citation omitted).

B.     The Demand Requirement

Derivative suits permit "an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties.'" Kamen v. Kemper Fin. Servs., 500 U.S. 90, 95 (1991) (emphasis in original) (citing Ross v. Bernhard, 396 U.S. 531, 534, (1970)).

Under Delaware law, "[a] stockholder may not pursue a derivative suit to assert a claim of the corporation unless the stockholder: (a) has first demanded that the directors pursue the corporate claim and the directors have wrongfully refused to do so; or (b) establishes that pre-suit demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation." Wood v. Baum, 953 A.2d 136, 140 (Del. 2008). "[T]he demand requirement implements 'the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders.'" Kamen, 500 U.S. at 101 (citation omitted). "[T]he demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations." Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984).

"The purpose of the demand requirement is to affor[d] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." Kamen, 500 U.S. at 96 (internal quotation marks and citations omitted). In short, "[t]he purpose of requiring a precomplaint demand is to

protect the directors' prerogative to take over the litigation or to oppose it." Id. at 101. "A board may in good faith refuse a shareholder demand to begin litigation even if there is substantial basis to conclude that the lawsuit would eventually be successful on the merits. It is within the bounds of business judgment to conclude that a lawsuit, even if legitimate, would be excessively costly to the corporation or harm its long-term strategic interests." In re InfoUSA, Inc. S'holders Litig., 953 A.2d 963, 986 (Del. Ch. 2007).

These interests are particularly relevant where, as here, a shareholder derivative action seeks recovery on the basis of the same allegations alleged against the company in a federal securities class action also pending before this Court.[4] See South v. Baker, 62 A.3d 1, 25 (Del. Ch. 2012) (noting that the pursuit of a derivative action during the pendency of other related litigation against the corporation "may well compromise the corporation's position on the merits, thereby causing or exacerbating precisely the harm that the . . . plaintiff ostensibly seeks to remedy").

C.    When Demand Is Excused

Under Delaware law, demand is not required if the facts pled show that such demand would have been futile. Aronson, 473 A.2d at 808. Demand is futile when, "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was

---

[4] As is described in detail in defendants' opening brief, the allegations in the Amended Complaint are not only related to those advanced by lead plaintiffs in In re Lululemon Securities Litigation, 13 Civ. 4596 (KBF), they are in many instances copied verbatim or with minimal conforming changes from the operative complaint in that action. (See Mem. of Law at 7-8, ECF No. 22.) This dramatic degree of overlap further heightens the importance of the demand requirement for bringing a derivative action as applied to the facts and circumstances of the instant actions.

12

otherwise the product of a valid exercise of business judgment." Id. at 814. In cases where plaintiffs allege that board inaction, rather than board action, renders demand futile, courts focus on the first prong of the Aronson test. In such cases, courts must determine whether the "particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993); see also Wood, 953 A.2d at 140 (describing situations in which to apply the Aronson and Rales tests).

In light of the allegations in the Amended Complaint and the arguments provided in opposition to the instant motions—that the Defendant Directors caused, allowed, or permitted lululemon to disseminate false and misleading information, failed to maintain internal controls, and failed to take action as to Wilson's June 2013 stock sales[5] (see Am. Compl. ¶¶ 208(b)-(f); Opp. at 17-22, ECF No. 24)—there can be no dispute that the allegations in these actions implicate the Rales test for demand futility concerning board inaction.

The reasonable doubt standard "can be said to mean that there is a reason to doubt"; "[t]his concept is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." Grimes v.

---

[5] Though plaintiffs argue that the Defendant Directors "facilitated" Wilson's June 2013 stock sales, the manner of facilitation they allege is failing to act so as to stop Wilson from executing those sales. (Opp. at 17-18.) Plaintiffs do not allege that lululemon's directors made a decision to make false or misleading statements, or to fail to maintain internal controls, so "the subject of the derivative suit is not a business decision of the board." Rales, 634 A.2d at 934.

Donald, 673 A.2d 1207, 1217 (Del. 1996).  Though the reasonable doubt standard

does not require plaintiffs to demonstrate a reasonable probability of success on the

merits, see Rales, 634 A.2d at 934, it does not water down the pleading threshold

requiring that reasonable doubt be pled with particularized facts sufficient to

overcome the presumption that directors are "faithful to their fiduciary duties."

Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d at 1050

n.26, 1048-49 (Del. 2004).  Courts "draw all reasonable inferences in the plaintiff's

favor," but only if they "logically flow from particularized facts alleged by the

plaintiff."  Wood, 953 A.2d at 140 (quoting Beam, 845 A.2d at 1048).

Under Delaware law, plaintiffs who are seeking to allege such reasonable

doubt may do so in at least two ways.  First, plaintiffs must allege particularized

facts that "show that a given director is personally interested in the outcome of the

litigation, in that the director will personally benefit or suffer as a result of the

lawsuit."  InfoUSA, 953 A.2d at 985.  The "existence of some financial ties between

the interested party and the director, without more, is not disqualifying"; "[t]he

inquiry must be whether, applying a subjective standard, those ties were material,

in the sense that the alleged ties could have affected the impartiality of the

individual director."  Kahn v. M & F Worldwide Corp., No. 334, 2013, 2014 WL

996270, at *10 (Del.  Mar. 14, 2014) (citations omitted).

Second, plaintiffs must allege particularized facts that demonstrate a director

faces a substantial likelihood of liability related to the subject of the proposed

demand.  See, e.g., Ryan v. Gifford, 918 A.2d 341, 355 (Del. Ch. 2007) (internal

14

quotation marks and citation omitted).  A "'mere threat of personal liability . . . is
insufficient to challenge either the independence or disinterestedness of directors'"
in order to excuse demand.  Wood, 953 A.2d at 141 n.11 (quoting Aronson, 473 A.2d
at 815).  "Without a substantial threat of director liability, a court has no reason to
doubt the board's ability to address the corporate trauma and evaluate a related
demand."  South, 62 A.3d at 14.  "A simple allegation of potential directorial
liability is insufficient to excuse demand, else the demand requirement itself would
be rendered toothless, and directorial control over corporate litigation would be
lost."  In re Goldman Sachs Grp., Inc. S'holder Litig., Civ. A. No. 5215-VCG, 2011
WL 4826104, at *18 (Del. Ch. Oct. 12, 2011).

  "[A] derivative complaint must plead facts specific to each director,
demonstrating that at least half of them could not have exercised disinterested
business judgment in responding to a demand."  Desimone v. Barrows, 924 A.2d
908, 943 (Del. Ch. 2007); see Blaustein v. Lord Baltimore Capital Corp., 84 A.3d
954, 958 (Del. 2014) ("[A] plaintiff must allege with particularity that a majority of
the board lacks independence or is otherwise incapable of validly exercising its
business judgment.").  The "'group' accusation mode of pleading demand futility" is
insufficient.  In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 121 n.36
(Del. Ch. 2009); see In re ITT Corp. Derivative Litig., 588 F. Supp. 2d 502, 511
(S.D.N.Y. 2008) ("Whether the Directors face a substantial likelihood of liability
must be determined on a director-by-director basis, and thus Plaintiffs' conflation of
all the directors into a single entity is insufficient under Rule 23.1.").

In sum, alleging that demand is excused is "a difficult feat." <u>Ryan</u>, 918 A.2d at 352 n.23 (Del. Ch. 2007). "[C]onsistent with the long-standing principle that directors and not shareholders manage a corporation, the Delaware precedents on demand futility make clear that the bar is high, the standards are stringent, and the situations where demand will be excused are rare." <u>Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines</u>, 534 F.3d 779, 782-83 (D.C. Cir. 2008).

III.   DISCUSSION

In the Amended Complaint, plaintiffs allege one federal claim—violation of Section 14(a) of the Securities Exchange Act and Rule 14a-9 thereunder as a result of alleged false or misleading statement in the 2013 Proxy (Count VII).  Plaintiffs allege two sets of state law claims: (1) breach of fiduciary duty for (i) disclosure violations (Count I), (ii) failures to maintain internal controls (Count II), and (iii) insider trading (Count IV), and (2) claims arising out of the alleged breaches of fiduciary duty: (i) unjust enrichment (Count III), (ii) abuse of control (Count V), and (iii) gross mismanagement (Count VI).  All of plaintiffs' claims are asserted against all defendants except the Count IV insider trading claim, which is asserted against defendants Wilson and Day only.

Plaintiffs concede that no demand to institute these actions was made on lululemon's Board of Directors; instead, plaintiffs allege demand is futile and excused.  (<u>See</u> Am. Compl. ¶ 208.)  Plaintiffs further concede that, because the Board consisted of the eleven Director Defendants at the time these actions were initiated (<u>id.</u>), plaintiffs must raise a reasonable doubt as to the disinterestedness or

16

independence of six directors in order to adequately plead demand futility.[6]  (Opp. at 12.)  Even assuming, without deciding, that demand is excused as to Wilson and Day, plaintiffs fail to allege the kind of particularized allegations required by Rule 23.1 and Delaware law as to <u>any</u> (let alone four) Director Defendants.

Plaintiffs argue that demand is excused as to all Director Defendants for two sets of reasons: (A) that the Director Defendants' "conscious inaction in the face of Wilson's illicit trading is the result of a lack of independence and domination of Wilson over the Board" (Opp. at 18); and (B) that the Director Defendants' face a substantial likelihood of liability because they consciously or recklessly disregarded "red flags" concerning lululemon's quality control issues (<u>id.</u> at 20.)

These arguments are without merit.

A.    <u>Control and Domination by Wilson</u>

Plaintiffs argue that the allegations in the Amended Complaint as to Wilson's stock sales, their timing, and the Board's knowledge of those sales, coupled with more general allegations about Wilson's control and influence over the Board, are sufficient to plead demand futility as to all Director Defendants.  (<u>Id.</u> at 18-19.) According to plaintiffs, "the only reasonable, common sense, pragmatic inference fairly drawn from the facts is that the Board cannot act independently or with disinterest here."  (<u>Id.</u> at 19.)  At oral argument, plaintiffs' counsel articulated this argument more bluntly: demand is excused as to at least the four Director Defendants who were members of the Audit Committee because they failed to take

---

[6] Non-Director Defendants Currie and Waterson are not relevant to determining whether demand is futile.  <u>See</u> <u>In re Forest Labs., Inc. Derivative Litig.</u>, 450 F. Supp. 2d 379, 381 (S.D.N.Y. 2006).

any punitive action toward Wilson after learning of his June 2013 trading, and that this failure shows both domination and control by Wilson and a substantial likelihood of liability for these Director Defendants.[7] (See 4/4/14 Tr. at 59-66.)

The Court disagrees with both formulations of plaintiffs' argument. Under Delaware law, plaintiffs "must plead facts that would support the inference that because of the nature of a relationship or additional circumstances . . . the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." Beam, 845 A.2d at 1052. Whether plaintiffs have pled sufficient facts must be resolved on a director-by-director basis through an analysis of the particularized factual allegations. Khanna v. McMinn, No. Civ. A. 20545-NC, 2006 WL 1388744, at *15 (Del. Ch. May 9, 2006).

The allegations in the Amended Complaint fall far short of this standard. Plaintiffs fail to plead particularized allegations as to the disinterestedness or independence of any of the Director Defendants as it relates to Wilson and his June 2013 trading. Plaintiffs primarily rely on an argument that Wilson allegedly engaged in insider trading prior to Day's resignation announcement on June 10, 2013, that the Director Defendants knew it at that time or very shortly thereafter, and by doing nothing, demonstrated their lack of independence. The allegations in

---

[7] Plaintiffs' assertion that demand is excused because the Director Defendants faced a substantial likelihood of liability is discussed more fully in Section III.B infra. Though plaintiffs' counsel suggested at oral argument that this liability was for aiding and abetting Wilson's alleged insider trading (see 4/4/14 Tr. at 62), no such claim is asserted against the Director Defendants in the Amended Complaint. (Count IV, for state law insider trading, is asserted against Wilson and Day only.) Further, any breach of fiduciary duty claim premised on the Director Defendants' conduct related to Wilson's June 2013 trading fails for the same reasons set forth herein—plaintiffs do not plead particularized facts as to the knowledge of any Director Defendants that Wilson's trading was inconsistent with his trading plan, and instead ask the Court to make unreasonable inferences as to their motivations for alleged inaction.

18

Amended Complaint do not support this story or the inferences plaintiffs urge this Court to make.

First, though plaintiffs allege that the Director Defendants knew of Day's resignation no later than June 7, 2013 (see Am. Compl. ¶ 198), they do not allege any facts as to the Director Defendants' knowledge of Wilson's trading during the period June 4-7, 2013.  Second, though plaintiffs allege that Wilson's stock sales were made pursuant to a trading plan that was executed in December 2012 and permitted stock sales on a semi-regular basis (see id. ¶¶ 32 n.6, 195), they do not allege any facts that show Wilson's trading was inconsistent with that plan.[8]  Third, though plaintiffs allege that both Wilson's trading and the fact that he had a trading plan were public knowledge (see 4/4/14 Tr. at 59-61; Am. Compl. ¶¶ 33, 198), they do not allege any facts that tend to show that the Director Defendants knew Wilson's trading was inconsistent with that plan.

Instead, plaintiffs ask this Court to infer that the Director Defendants were under such domination and control by Wilson that they deliberately exposed themselves to the risk of individual liability related to Wilson's June 2013 trading, which they believed to be improper, rather than resigning from the Board.  Though Wilson may have exercised significant influence over the Board and the company's

---

[8] Though Wilson's trading plan is explicitly referenced in the Amended Complaint, the plan itself has not been submitted in connection with the instant motions.  Wilson's trading plan was filed under seal as an exhibit in support of lululemon's motion to dismiss in the related securities class action. See In re Lululemon Sec. Litig., No. 13 Civ. 4596 (KBF), ECF No. 52-1 (S.D.N.Y. Feb. 18, 2014).  The Court need not reach the issue of whether Wilson's trading plan is properly considered on the instant motion to dismiss because, even accepting plaintiffs' allegations about Wilson's trading and his trading plan as true, plaintiffs fail to allege facts sufficient to excuse demand on this basis.

culture, there are no particularized allegations in the Amended Complaint that credibly suggest such a conclusion.

Plaintiffs also fail to allege particularized facts that tend to show Wilson controlled and dominated the Director Defendants because they supposedly "facilitated" Wilson's re-election to the Board by not disclosing "internal turmoil" at lululemon.  (Opp. at 18-19; Am. Compl. ¶ 236.)  As is discussed in Section III.B.1 infra, plaintiffs fail to allege particularized facts that tend to show that the 2013 Proxy associated with this election was materially false or misleading at the time it was issued.  Plaintiffs fail to allege any particularized facts that tend to show that the Director Defendants prepared or were directly responsible for these disclosures; in fact, the general allegations that the Director Defendants caused or allowed lululemon to issue certain statements (see Am Compl. ¶ 211) are the kind of allegations that courts often find insufficient for the purpose of excusing demand.[9] See Citigroup, 964 A.2d at 133 n.88, 134; see also In re Goldman Sachs Mortg. Servicing S'holder Derivative Litig., No. 11 Civ. 4544 (WHP), 2012 WL 3293506, at *9 (S.D.N.Y. Aug. 14, 2012) (citing Citigroup, 964 A.2d at 132-34).

In sum, plaintiffs' allegations concerning Wilson's stock sales, as they relate to the Director Defendants, are general and conclusory rather than factual and specific, and thus fail to overcome the presumption of directorial independence and to excuse demand.

---

[9] The Court notes that plaintiffs did not respond to this argument in either their opposition papers or at oral argument in any meaningful way.

B.    Substantial Likelihood of Liability

Plaintiffs next argue, in substance, that the Director Defendants face a substantial likelihood of liability, so as to excuse demand, because they were on notice of red flags concerning quality control issues at lululemon and failed to act in order to correct them.  (Opp. at 20-22.)  This argument, viewed in context of each of the claims alleged in the Amended Complaint against the Director Defendants,[10] is without merit.  Plaintiffs fail to allege a substantial likelihood of liability for any of the Director Defendants as to any of these claims.

1.    Section 14(a) of the Securities Exchange Act (Count VII)

Liability under Section 14(a) and Rule 14a-9 thereunder requires, inter alia, a materially false or misleading statement in a proxy statement.  See 17 C.F.R. § 240.14a-9 ("[n]o solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which . . . is false or misleading"); In re J.P. Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) (requiring "a material misrepresentation or omission"); see also Koppel v. 4987 Corp., 167 F.3d 125, 131 (2d Cir. 1999).  Additionally, the Private Securities Litigation Reform Act requires that plaintiffs "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

---

[10] As noted above, plaintiffs assert all claims against Director Defendants except for the Count IV state law insider trading claim, which is asserted against Wilson and Day only.

The basis for plaintiffs' Section 14(a) claim is that the statements in the 2013 Proxy were "false and misleading" when they were made because they "facilitated Defendant Wilson's re-election to the Board" by not disclosing "internal turmoil at Lululemon that would result in Defendant Day either stepping down or being effectively fired after the close of business on June 10, 2013." (Am. Compl. ¶ 236.)

As described in Section I.D <u>infra</u>, the 2013 Proxy, as excerpted in the Amended Complaint, contains two paragraphs related Day and Wilson. The 2013 Proxy contains factual statements about Day's history with the company, her prior work history, her service on other boards of directors, and her educational background. (<u>Id.</u> ¶ 204.) It further states that Day was selected as a director because of this extensive experience. (<u>Id.</u>) With respect to Wilson, the 2013 Proxy states that Wilson is the Chairman of the Board, and that the Board "believes that Mr. Wilson, as the founder of lululemon, is in a unique position to support continuity in both the product vision and the cultural values of our company that have been an integral part of our success, and his role as Chairman of the Board enables him to be more effective in this role." (<u>Id.</u>)

Plaintiffs fail to allege that any of the assertions in the 2013 Proxy contained material misrepresentations or omissions when made. Plaintiffs do not allege that any of the factual statements about Day and Wilson were inaccurate. Further, plaintiffs do not allege particularized facts that indicate the Director Defendants did not believe that Day was selected as a director because of her experience, or did not believe that Wilson was not in the "unique position" so described. This is due,

in large part, to the fact that plaintiffs allege no particularized facts that any of the
Director Defendants had knowledge or believed that Day's resignation was
"imminent," or that she would announce her resignation in June 2013, as of April
30, 2013.  The failure to disclose unspecified "internal turmoil" in the 2013 Proxy
thus does not constitute an actionable omission.  The allegations in the Amended
Complaint thus fail to create a substantial likelihood of liability as to any of the
Director Defendants under Section 14(a) as a result of the 2013 Proxy.

2.      Breach of Fiduciary Duty: Disclosure Violations (Count I)

To the extent plaintiffs allege that the Director Defendants face a substantial
likelihood of liability with respect to state law disclosure violations for other false
and misleading statements not made in connection with a request for shareholder
action, plaintiffs must allege that the Director Defendants deliberately misinformed
shareholders or knowingly disseminated false information.  See In re Nine Sys.
Corp. S'holders Litig., Consol. C.A. No. 3940-VCN, 2013 WL 771897, at *9 (Del. Ch.
Feb. 29, 2013); Citigroup, 964 A.2d at 132 (quoting Malone v. Brincat, 722 A.2d 5,
14 (Del. 1998)).  Plaintiffs fail to do so for any of the Director Defendants with the
required particularity.  At most, the Amended Complaint alleges that the Director
Defendants "caused" or "filed" certain financial reports with the SEC, or issued
certain press releases, that include statements as to the quality of lululemon's
products.  (See Am. Compl. ¶¶ 145, 149, 157, 161-64, 172-73.)  Nevertheless, as
defendants note, (1) the execution of "financial reports, without more, is insufficient
to create an inference that the directors had actual or constructive notice of any

23

illegality," <u>Wood</u>, 953 A.2d at 142; and (2) as is discussed in Section III.A, <u>supra</u>,

plaintiffs fail to allege any particularized facts suggesting that the Director

Defendants prepared or were directly responsible for these statements such that

demand would be excused.

3.    <u>Breach of Fiduciary Duty: Failure to "Maintain Internal Controls" (Count II)</u>

Plaintiffs allege that the Director Defendants face a substantial likelihood of

liability with respect to Count II because they "willfully ignored the obvious and

pervasive problems with Lululemon's internal control practices and procedures and

failed to make a good faith effort to correct the problems or prevent their

recurrence." (Am. Compl. ¶ 215.) Plaintiffs expressly disclaim that either Count II

or the other Counts in the Amended Complaint allege a duty of care claim based on

<u>In re Caremark</u> <u>International Derivative Litigation</u>, 698 A.2d 959 (Del. Ch. 1996).

(<u>See</u> Opp. at 22 n.19.)[11]

Plaintiffs argue that the factual basis for this claim is three "widely

publicized 'red flags': (1) in 2007 . . . the Company was forced to withdraw claims

that its clothing incorporating seaweed fiber provided health benefits ([Am. Compl.]

¶¶ 186-88); (2) in December 2010, it was revealed that the Company . . . had

---

[11] To the extent any such claim is embedded in Count II or any of the other Counts, the Court finds
that it also does not serve as a basis to excuse demand. Lululemon's shareholders have adopted an
amendment to the company's certificate incorporation which, <u>inter alia</u>, eliminates director liability
"[t]o the fullest extent permitted" by Delaware law (Allerhand Decl. Ex. A, Art. IX, § 9.1, ECF No.
23), which, under Del. Code Ann. tit. 8, § 102(b)(7), "authorizes Delaware corporations . . . to
exculpate their directors from monetary damage liability for a breach of the duty of care." <u>In re Walt</u>
<u>Disney Co. Derivative Litig.</u>, 906 A.2d 27, 65 (Del. 2006). Courts consider similar exculpatory
provisions to that contained in the lululemon certificate of incorporation in determining whether
plaintiffs have alleged facts showing a substantial likelihood of liability that would excuse demand.
See <u>Wood</u>, 953 A.2d at 141; <u>Citigroup</u>, 964 A.2d at 124-25.

24

shipped and distributed shopping bags that were printed using ink that contained high levels of lead ([id.] ¶¶ 189-90); and . . . (3) in late 2011, and early 2012, numerous Lululemon customers complained that Lululemon's garments were defective (including garments that contained luon) because their colors bled . . . or became sheer ([id.] ¶¶ 191-92)."  (Opp. at 21.)

At most, these instances reflect three quality control issues faced by the company since 2007, two of which had nothing to do with luon pants.  Plaintiffs fail, however, to allege what if anything the Director Defendants did or failed to do in response to these alleged red flags, including whether or not the Director Defendants consulted management or otherwise investigated these issues.  See Citigroup, 964 A.2d at 128-29; see also La. Mun. Police Emps. Ret. Sys. v. Pandit, No. 08 Civ. 7389 (LTS), 2009 WL 2902587, at *8 (S.D.N.Y. Sept. 10, 2009). Accordingly, plaintiffs fail to allege with particularity a substantial likelihood of liability as to Count II as would excuse demand on the Director Defendants.[12]

### 4. Claims Arising Out of Alleged Breaches of Fiduciary Duties (Counts III, V, and VI)

Plaintiffs' claims for unjust enrichment, abuse of control, and gross mismanagement against the Director Defendants are premised on the same alleged breaches of fiduciary duty described above (see Am. Compl. ¶¶ 218, 226, 231-33), and which the Court has found fail to create a substantial likelihood of liability for

---

[12] Plaintiffs also fail to plead particularized allegations giving rise to a substantial likelihood of liability as to any of the Director Defendants arising out of Wilson's June 2013 trading.  See Section III.A, supra.

the Director Defendants so as to excuse demand.  Demand is thus also not excused on the basis of these claims.

IV.   CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the Amended Complaint pursuant to Rule 23.1 is GRANTED, because plaintiffs have failed to adequately allege particularized facts showing demand on lululemon's Board of Directors was excused.  The Court thus DISMISSES the complaint without prejudice, in the event plaintiffs seek to pursue these claims after making a demand on the Board.

Accordingly, the pending motions to intervene by the Laborers' District Council Construction Industry Pension Fund and the Hallandale Beach Police Officers and Firefighters' Personnel Retirement Fund are DENIED as moot.

The Clerk of Court is directed to close the motions at ECF Nos. 21, 36, and 43 in 13 Civ. 5629, and ECF Nos. 22, 37, and 44 in 13 Civ. 5977.  The Clerk of Court is also directed to close both actions.

SO ORDERED.

Dated:     New York, New York
           April __7__, 2014

                                        _____
                                             KATHERINE B. FORREST
                                             United States District Judge

26